[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10790
_____

D.C. Docket No. 2:10-cv-00542-MEA-MRM

GAUDENCIO GARCIA-CELESTINO,
individually and on behalf of all other persons similarly situated,
RAYMUNDO CRUZ-VICENCIO,
individually and on behalf of all other persons similarly situated,
RAUL ISMAEL ESTRADA-GABRIEL,
individually and on behalf of all other persons similarly situated,
DANIEL FERRO-NIEVES,
individually and on behalf of all other persons similarly situated,
JOSE MANUEL FERRO-NIEVES,
individually and on behalf of all other persons similarly situated, et al.,

Plaintiffs - Appellees,

versus

RUIZ HARVESTING, INC., et al.,

Defendants,

CONSOLIDATED CITRUS LIMITED PARTNERSHIP,

Defendant - Appellant,

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 15, 2016)

Before TJOFLAT and HULL, Circuit Judges, and BYRON,[*] District Judge.

HULL, Circuit Judge:

This appeal arises from a labor dispute involving the H-2A visa program. Defendant Consolidated Citrus Limited Partnership ("Consolidated Citrus") appeals from the district court's order granting judgment in favor of the plaintiffs and holding Consolidated Citrus liable as a joint employer. After review of the record and with the benefit of oral argument, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

This litigation has a complex history. We first introduce the parties relevant to this appeal. Next we discuss the way that Consolidated Citrus and its labor contractors managed their daily harvesting operations, the payment arrangements between Consolidated Citrus and it labor contractor, and the kickback scheme that formed the basis of the plaintiffs' claims. We then recount the course of the proceedings in the district court.

_____

[*] Honorable Paul G. Byron, United States District Judge for the Middle District of Florida, sitting by designation.

2

## A.    Parties

In the initial complaint, eight plaintiffs brought claims against defendants Consolidated Citrus, Ruiz Harvesting, Inc. ("RHI"), and Basiliso Ruiz ("Ruiz"). All original plaintiffs were Mexican nationals who came to the United States temporarily to work as harvesters on citrus groves in central Florida.[1]  These plaintiffs entered the United States legally under the federal H-2A visa program, which is detailed below.  See Part II, infra.  The plaintiffs were employed as temporary laborers during the 2006-07, 2007-08, 2008-09, and/or 2009-10 harvest seasons.

Defendant Consolidated Citrus is a large citrus producer with groves throughout the state of Florida.  Consolidated Citrus cultivates several types of oranges, most of which it sells to processing companies to be pressed into juice.

Harvesting is a large part of Consolidated Citrus's operations.  Each harvest season typically runs from late November through May or early June.  During the 2005-06 harvest season, Consolidated Citrus struggled to find sufficient labor to meet its harvesting needs.  Starting with the 2006-07 harvest season, Consolidated Citrus began working with labor contractors to hire temporary foreign workers.

---

[1]The plaintiffs later amended their complaint to include claims brought by one plaintiff who was recruited from within the United States and thus did not fall under the H-2A program. Thirty eight total plaintiffs were named in the amended complaint, thirty seven of whom were foreign H-2A workers.

3

One such labor contractor was defendant RHI, owned by defendant Ruiz. As a labor contractor, RHI acted as a liaison between Consolidated Citrus and the temporary workers. RHI would recruit these temporary workers from Mexico and help the workers complete the necessary paperwork for obtaining H-2A visas. For the workers to obtain these visas, RHI was required to file applications with the Department of Labor ("DOL"), which issued certifications allowing RHI to employ temporary foreign workers. Though RHI completed these applications at the direction of Consolidated Citrus, the applications listed RHI as the temporary workers' employer. Once the workers obtained visas, RHI arranged for the workers to travel to the United States and provided housing for the workers in Florida for the duration of their employment.

## B.    Harvesting Operations and Worker Management

Before the harvest season began, Consolidated Citrus supervisors tested the fruit in various groves to gauge its readiness for picking. When Consolidated Citrus determined that a particular block of trees was ready for harvesting, Consolidated Citrus would direct RHI to bring a crew of workers to that area and would tell RHI how much fruit the workers should harvest from that block.

Consolidated Citrus expected the temporary workers to be at their assigned groves at some time in the early morning, but RHI personnel ultimately decided

4

what time the workers would arrive.  Each day, RHI transported workers to and from the groves in RHI vehicles.

Before the harvest season began, Consolidated Citrus issued identification badges to all RHI personnel and temporary workers.  Each day when the workers arrived at their assigned groves, they would clock in by scanning their identification badges in a time-tracking device owned by Consolidated Citrus.

During the relevant time periods, citrus groves throughout Florida were blighted by a disease called "citrus canker."  Consolidated Citrus implemented procedures designed to prevent harvest workers from spreading the disease from grove to grove.  All harvesters were required, before beginning their daily work, to walk through an anti-bacterial mist and to dip their picking sacks into a barrel of decontamination solution.  Consolidated Citrus personnel supervised these citrus canker prevention procedures.

After clocking in and finishing the citrus canker prevention procedures, the workers brought in by RHI could start harvesting fruit.  RHI provided the workers with ladders, picking sacks, drinking water, and portable toilets for use at the work sites.  Once a worker filled a picking sack with fruit, the worker would unload the contents into a tub owned by RHI.  When the tub was full, an RHI employee, operating lift equipment owned by RHI, would then raise the tub into a large fruit trailer so that the fruit could be transported to the processor.  This would continue

until the workers had picked the desired amount of fruit from the block to which they were assigned.

Consolidated Citrus supervisors were present to oversee the harvesting process, but each Consolidated Citrus supervisor individually had to oversee as many as ten crews each day, with each crew consisting of around twenty five workers (i.e., approximately 250 workers). Some of these were RHI crews and others were crews of workers brought in by other labor contractors or hired by Consolidated Citrus itself. The crews were spread over an area spanning 8,000 acres, meaning that a Consolidated Citrus supervisor could monitor each outside crew for only a very limited period of time. If a Consolidated Citrus supervisor noticed an issue with the harvest work, the supervisor would report it to the RHI crew leader. Notably, the Consolidated Citrus supervisors did not direct or instruct the workers; rather RHI did. Consolidated Citrus did reserve the authority, however, to halt the workers' activities whenever Consolidated Citrus personnel determined that something was wrong with the harvesting process.

Even so, as compared to their oversight of Consolidated Citrus's own in-house workers, Consolidated Citrus supervisors took on little to no supervisory role when overseeing the work of RHI harvesting crews. If a Consolidated Citrus supervisor was monitoring a crew of its own in-house harvesters, for example, the supervisor would check on equipment, handle equipment repairs, document

6

workplace injuries, resolve disputes between workers, and tell workers when to report back in Florida after a period of leave. When overseeing RHI workers, Consolidated Citrus supervisors did none of those things.

## C.    Consolidated Citrus's Payment Arrangement with RHI

Pursuant to a labor contract, Consolidated Citrus agreed to pay RHI a "pick and roadside rate" for RHI's services. The pick and roadside rate was determined based on "the net number of boxes of fruit harvested [by the temporary workers] as determined by the weight of the [harvested] fruit." This rate could vary based on the particular grove being harvested. Consolidated Citrus agreed to pay a minimum amount per box of oranges, but the amount Consolidated Citrus actually paid RHI per box was often higher than the minimum.

RHI then used these funds to cover its operating costs and pay wages owed to the temporary workers. Rather than paying hourly wages, RHI paid the workers based on the amount of fruit they harvested. RHI paid the workers for each box of picked fruit at the "piece rate," which was usually between $0.85 and $0.90 per box. Though Consolidated Citrus assumed, for purposes of setting the pick and roadside rate, that RHI would pay workers at a piece rate of at least $0.70, RHI was solely responsible for deciding the piece rate at which it paid the workers.

Under the H-2A program regulations, agricultural workers compensated on a piece-rate basis must be paid at least the equivalent of the wages they would have

7

received under the applicable "adverse effect wage rate" ("AEWR"), which is the hourly minimum set by the DOL.  See Part II, infra.  Where a worker's piece-rate wages do not add up to the wages the worker would have earned under the hourly rate, the employer must supplement that worker's earnings to meet that minimum wage.  This supplemental amount is known as "build-up" pay.

RHI's third-party bookkeeper kept track of both the total number of hours each harvester worked and the amount of fruit the workers harvested.  Though RHI ultimately issued paychecks based on its own bookkeeping, Consolidated Citrus was involved in the calculation of hours in two ways.  First, using the data from its own time-keeping system, Consolidated Citrus provided daily reports to RHI summarizing the number of hours each RHI worker logged.  Second, when Consolidated Citrus sent this information to RHI, Consolidated Citrus unilaterally deducted one hour from each worker's daily total to account for the time it took for the workers to travel between the grove entrance and the actual picking site. Where necessary based on the number of hours logged and the applicable AEWR, RHI's bookkeeping software automatically added build-up pay to workers' paychecks.

### D.    RHI Kickback Scheme

RHI perpetrated a kickback scheme to recoup this build-up pay.  Ruiz and other RHI representatives told the H-2A temporary workers that the build-up pay

8

came directly from Ruiz's pocket and that if the workers did not return the build-up pay, RHI would send the workers back to Mexico.  On payday, RHI employees drove the H-2A temporary workers to the bank where the workers cashed their paychecks.  The workers then returned to the RHI vehicle, where an RHI employee collected cash from each worker in an amount equal to that worker's build-up pay.  H-2A workers were told to return money only to Ruiz and RHI and only when the workers' paychecks included build-up pay.

It is undisputed that Consolidated Citrus was unaware of RHI's kickback scheme.  No one from Consolidated Citrus demanded that H-2A temporary workers return their build-up pay, and no H-2A temporary worker ever complained directly to Consolidated Citrus about RHI's kickback scheme.

## E.    Procedural History

In September 2010, eight original plaintiffs filed this action in the United States District Court for the Middle District of Florida on behalf of themselves and a putative class of similarly situated individuals.  In March 2011, the plaintiffs filed an amended complaint, this time naming thirty eight plaintiffs and again including class allegations.  In the amended complaint, the plaintiffs asserted claims under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") (Counts I-III), under the Fair Labor Standards Act ("FLSA") (Count IV), for common law

breach of contract (Count V), and for violations of Florida's minimum wage laws (Count VI).

In January 2012, four of the plaintiffs settled their claims against all defendants. In October 2012, the district court approved a separate settlement of all claims raised by Francisco Suarez-Galan, who was the sole non-H-2A plaintiff. Suarez-Galan was also the only plaintiff whose claims arose during the 2006-07 season and the only plaintiff asserting AWPA claims. The settlement of his claims eliminated Counts I-III.

In February 2012, the district court certified a class of "[a]ll temporary foreign workers ("H-2A workers") who were employed pursuant to temporary labor certifications issued to [RHI] for work during the 2007-08, 2008-09, and/or 2009-10 Florida citrus harvests." The plaintiffs' class allegations pertained to only their breach of contract claims (Count V) and their Florida minimum wage claims (Count VI).

In May 2013, the district court dismissed defendants RHI and Ruiz from the action after approving a settlement agreement covering all claims against those two defendants. At this point, Consolidated Citrus was the sole remaining defendant, and the only remaining claims were the individual FLSA claims (Count IV),[2] the

---

[2]The plaintiffs' FLSA claims were predicated on the minimum wage provisions of that statute. In part, the plaintiffs alleged that the defendants failed to pay minimum wage as required under the FLSA because of the build-up pay kickback scheme. The plaintiffs also alleged that

class-wide breach of contract claims (Count V), and the class-wide Florida minimum wage claims (Count VI).

The parties filed cross-motions for summary judgment as to the remaining claims. The district court denied the plaintiffs' motion altogether, but granted in part and denied in part Consolidated Citrus's motion. As to the class-wide Florida minimum wage claims (Count VI), the district court determined that the plaintiffs failed to comply with the pre-suit notice requirements of the Florida Minimum Wage Act. The district court granted Consolidated Citrus's motion as to those Florida minimum wage claims and dismissed Count VI.

As to the FLSA claims (Count IV) and breach of contract claims (Count V), the district court denied Consolidated Citrus's motion for summary judgment. The central issue to be decided was whether Consolidated Citrus could be held liable as a joint employer with RHI. With respect to the breach of contract claims (Count V), the district court concluded that the expansive FLSA statutory standard applied for purposes of determining whether Consolidated Citrus was an H-2A joint employer during the 2007-08 and 2008-09 harvest seasons.[3]

_____

their pay fell short of the minimum wage required under the statute because the defendants did not reimburse workers for expenses the workers incurred while applying for visas and traveling to the United States.

[3]The district court determined that the narrow common law principles of agency applied for purposes of determining whether Consolidated Citrus was a joint employer during the 2009-10 harvest season. The plaintiffs later dropped all claims relating to that 2009-10 season.

11

The district court also determined that genuine issues of fact precluded summary judgment on the issue of Consolidated Citrus's liability as a joint employer under that FLSA standard.  The parties proceeded to trial for resolution of the remaining FLSA claims (Count IV) and breach of contract claims (Count V).  After a bench trial, the district court concluded that, for purposes of claims relating to the 2007-08 and 2008-09 seasons, Consolidated Citrus constituted a joint employer under the broad FLSA standard.  The district court entered judgment in favor of the plaintiffs and ordered Consolidated Citrus to pay damages totaling $2,722.20 on the individual FLSA claims (Count IV) and $192,434.34 on the class-wide breach of contract claims (Count V).

In February 2016, Consolidated Citrus timely filed a Notice of Appeal.  On appeal, Consolidated Citrus primarily argues that the common law principles of agency, and not the FLSA statutory "suffer or permit to work" standard, govern whether Consolidated Citrus is a joint employer for purposes of the plaintiffs' breach of contract claims.  As to the FLSA claims, for which all parties agree that the FLSA statutory "suffer or permit to work" standard applies, Consolidated Citrus argues that the trial evidence shows that it is not a joint employer even under that expansive FLSA statutory "suffer or permit to work" standard.

Below, we outline the relevant statutory and regulatory principles.  Next, as to the breach of contract claims, we discuss whether the FLSA standard or the

common law principles of agency govern whether Consolidated Citrus qualifies as a joint employer for the 2007-08 and 2008-09 harvest seasons.  After concluding that the narrower common law standard applies to the breach of contract claims, we remand to the district court to apply that governing legal standard to the extensive factual findings made by the trial judge.  But as to the FLSA claims, we agree with the district court that, under the evidence in this case, Consolidated Citrus is a joint employer under the expansive FLSA statutory "suffer or permit to work" standard.[4]

## II.  STATUTORY AND REGULATORY OVERVIEW

We start by discussing the statutory basis of the H-2A visa program and the varying ways in which "employer" and other related terms, such as "employ" and "employee," have been interpreted in relation to the H-2A program.

### A.    H-2A Visa Program

The federal H-2A visa program is a statutory creature of the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. 99-603, 100 Stat. 3359, which amended certain provisions of the Immigration and Nationality Act ("INA").  See 8 U.S.C. § 1101(a)(15)(H)(ii)(a) (defining temporary agricultural workers as a class of "nonimmigrant aliens"); 8 U.S.C. § 1188(i)(2) (defining "H-2A worker" as

---

[4]After a bench trial, we review the district court's conclusions of law de novo and the district court's findings of fact for clear error.  Tartell v. S. Fla. Sinus & Allergy Ctr., Inc., 790 F.3d 1253, 1257 (11th Cir. 2015).  The question of whether to hold a company liable as a joint employer is a question of law.  Aimable v. Long & Scott Farms, 20 F.3d 434, 440 (11th Cir. 1994).

13

a nonimmigrant alien as defined in § 1101(a)(15)(H)(ii)(a)); 8 U.S.C. § 1188

(providing the conditions under which employers may hire foreign temporary

workers under the H-2A program).

Under the INA, as amended by the IRCA, an "employer" seeking to hire

temporary foreign agricultural workers must first obtain a certification from the

DOL.  8 U.S.C. § 1188(a)(1).  The Secretary of Labor is authorized to grant an

"employer" such certification where (1) "there are not sufficient workers who are

able, willing, and qualified" to perform the work and (2) employing foreign

workers "will not adversely affect the wages and working conditions of workers in

the United States similarly employed."  Id.  If the Secretary of Labor so certifies,

then the Attorney General may approve the petition to hire foreign workers.  Id.

The applicable H-2A regulations impose a number of requirements on an

"employer" of temporary workers under the program.  An "employer" seeking to

hire H-2A workers must file an application with the DOL, commonly called a

"clearance order," which includes a copy of the job offer for which the "employer"

is seeking candidates.  20 C.F.R § 655.101(b)(1) (2006);[5] See Arriaga v. Fla. Pac.

Farms, L.L.C., 305 F.3d 1228, 1233 n.5 (11th Cir. 2002) (noting that the

application is commonly called a "clearance order").  The clearance order must

---

[5]The regulations governing the H-2A program have been amended and renumbered since the initiation of this action.  For the sake of clarity, except where otherwise noted, in Part II.A we reference the version of the regulations that were in force between 2006 and 2015.

14

contain the terms and conditions of employment as dictated by the H-2A regulations. 20 C.F.R. § 655.101(b)(1) (2006); 20 C.F.R. § 655.102 (2006); 20 C.F.R. § 653.501 (2006). The "employer" also must attach to the application an agreement to abide by all H-2A regulations. 20 C.F.R. § 655.101(b)(2) (2006).

The H-2A regulations further require an "employer" to provide certain minimum benefits to H-2A temporary workers. By requiring that the "employer" provide these baseline benefits, the regulations ensure that foreign workers will not appear more attractive to the "employer" than domestic workers, thus avoiding any adverse effects for domestic workers. See 20 C.F.R. § 655.102(a) (2006). The benefits ensure minimum working standards, including adequate wages, sufficient benefits, and sound working conditions. See 20 C.F.R. § 655.102(b) (2006). For example, the regulations require that the foreign workers be provided with housing, meals, equipment, and transportation. See id.

Especially pertinent here is that the H-2A regulations require that the "employer" pay workers either the AEWR or the federal minimum hourly wage rate, whichever is higher. 20 C.F.R. § 655.102(b)(9)(i) (2006). The AEWR is the minimum hourly wage rate that is necessary, in the estimation of the DOL, to ensure that wages of similarly employed domestic workers will not be adversely affected by the hiring of foreign H-2A workers. 20 C.F.R. § 655.100(b) (2006). The DOL publishes the applicable AEWR at least once each year. See 20 C.F.R.

15

§655.120(c) (2016). Where the worker is paid on a piece-rate basis and the worker's total pay is less than the worker would have received on an hourly basis, the "employer" must supplement the worker's pay so that the pay is commensurate with the pay that the worker would have received had the worker been paid hourly at the AEWR. 20 C.F.R. § 655.102(b)(9)(ii) (2006).

In addition, the H-2A regulations require the "employer" to provide each worker with a copy of the "work contract." 20 C.F.R. § 655.102(b)(14) (2006). The contract itself must include the required worker protections as set forth in the regulations. Id. If the employer does not provide a separate written contract, the clearance order, which the employer submits to apply for certification to hire H-2A workers, serves as the work contract. Id.

It is on the basis of the clearance order, which served as the workers' contracts, that the plaintiffs in this suit brought their breach of contract claims. The plaintiffs alleged that, because of the build-up pay kickback scheme, defendants RHI, Ruiz, and Consolidated Citrus did not pay H-2A workers what the workers would have received as hourly workers paid at the AEWR. The plaintiffs claimed that this constituted a breach of their work contracts. See Arriaga, 305 F.3d at 1246 (recognizing that a clearance order is an agreement upon which workers can bring breach of contract claims).

16

To be liable for breach of these H-2A contracts, Consolidated Citrus must qualify as an employer, or at least a joint employer, of the plaintiffs. Thus, as to the plaintiffs' breach of contract claims, Consolidated Citrus's liability turns on the meaning of "employer" and other related terms as they are used in the INA as amended by the IRCA.

## B.    "Employer" in the INA as Amended by the IRCA

The INA, as amended by the IRCA in 1986, uses the term "employer" over forty times in relation to the H-2A program. The INA as amended, however, does not explicitly define "employer." The INA as amended also does not define the related terms "employ," "employee," or "joint employer."

Consolidated Citrus contends that when Congress does not clearly define such a common term, courts should apply the settled common law meaning of the term. Consolidated Citrus offers two main reasons why the common law principles apply. First, Consolidated Citrus submits that the Supreme Court instructed in Nationwide Mutual Insurance Co. v. Darden, 503 U.S. 318, 112 S. Ct. 1344 (1992), that the settled common law meaning of a statutory term applies unless the statute otherwise clearly dictates or defines the term.

At issue in Darden was the meaning of the term "employee" as it is used in the Employee Retirement Income Security Act of 1974 ("ERISA"). Id. at 319, 112 S. Ct. at 1346. ERISA limits the classes of persons entitled to bring civil

17

enforcement actions under its substantive provisions.  29 U.S.C. § 1132(a).

Plaintiff Darden sought to bring an action under the ERISA provision that allows

an individual to sue in his capacity as a plan "participant," which is defined in the

statute as "any employee . . . of an employer" who is entitled to benefits under a

plan governed by ERISA.  Darden, 503 U.S. at 320-21, 112 S. Ct. at 1347; 29

U.S.C. §§ 1002(7), 1132(a)(1).  ERISA defines the term "employee" as "any

individual employed by an employer" and "employer" as "any person acting

directly as an employer . . . ."  29 U.S.C. § 1002(6), (5).  The Supreme Court in

Darden noted that ERISA's definition of "employee" is "completely circular and

explains nothing."  503 U.S. at 323, 112 S. Ct. at 1348.

The Supreme Court in Darden then explained how to construe the meaning

of a statutory term where the statute explains nothing helpful.  The Supreme Court

recognized that "[w]here Congress uses terms that have accumulated settled

meaning under . . . the common law, a court must infer, unless the statute

otherwise dictates, that Congress means to incorporate the established meaning of

these terms."  Id. at 322, 112 S. Ct. at 1348 (internal quotation marks omitted)

(quoting Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 739, 109 S. Ct.

2166, 2172 (1989)).  Thus, where Congress uses the term "employee" in a statute

but does not clearly define it, reviewing courts should assume that the term

"employee" refers to the "conventional master-servant relationship as understood

18

by common-law agency doctrine." Id. at 322-23, 112 S. Ct. at 1348 (internal quotation marks omitted) (quoting Reid, 490 U.S. at 740, 109 S. Ct. at 2172).

Second, Consolidated Citrus points out that in some labor statutes, but not all of them, Congress defined by statute what constitutes an employment relationship differently from and broader than the common law meaning. In the FLSA, which was adopted in 1938, Congress defined the term "employ" to "include[] to suffer or permit to work." 29 U.S.C. § 203(g). As interpreted by the Supreme Court, this statutory "suffer or permit to work" definition is one of the broadest possible delineations of the employer-employee relationship. See United States v. Rosenwasser, 323 U.S. 360, 362-63, 363 n.3, 65 S. Ct. 295, 296-97, 296 n.3 (1945). In 1983, when Congress enacted the AWPA,[6] it adopted the same sweeping statutory "suffer or permit to work" definition of the term "employ," incorporating the FLSA definition by reference. 29 U.S.C. § 1802(5). Notably, the H-2A provisions of the IRCA amendments to the INA did not adopt the expansive FLSA statutory definition and left the common term "employer" undefined.

---

[6]The AWPA provides certain labor rights to domestic agricultural workers and allows those workers to sue their employers to enforce those rights. See Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996). Counts I-III of the amended complaint asserted AWPA claims on behalf of the sole non-H-2A plaintiff.

19

## C.    H-2A Regulations from 1987 to 2008

Opposing Consolidated Citrus's position, the plaintiffs rely on the DOL's regulations.  We review (1) the DOL's regulations about the H-2A program in which the DOL defined "employer" using the FLSA's expansive statutory "suffer or permit to work" standard and (2) how the DOL in 2009 discarded that standard and amended those regulations to conform with Darden and to adopt the common law principles.  Although the DOL abandoned it in 2009, the plaintiffs contend that this 1987 regulation should apply here for purposes of the 2007-08 and 2008-09 harvest seasons.

Under the 1987 regulations for the H-2A program, the term "employer" was defined to mean "a person, firm, corporation or other association or organization which suffers or permits a person to work . . . as indicated by the fact that it may hire, pay, fire, supervise or otherwise control the work of any such employee."  20 C.F.R. § 655.100(b) (1987) (emphasis added).[7]  The 1987 regulation for the H-2A program did not say so, but the standard in that 1987 regulation is the same as the broad statutory definition used in the FLSA and the AWPA.

As noted above, the "suffer or permit to work" standard has been recognized as one of the broadest definitions of "employ" possible.  See Rosenwasser, 323 U.S. at 362-63, 363 n.3, 65 S. Ct. at 296-97, 296 n.3.  When determining whether

---

[7]The 1987 DOL regulation did not define the related terms "employ" or "employee."  See 20 C.F.R. § 655.100(b) (1987).

an employment relationship exists under this standard, courts are not guided by common law definitions of "employer" and "employee." Aimable v. Long & Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994). Rather, under this expansive approach, an entity is deemed to employ a worker where, as a matter of "economic reality" and under all the circumstances, the worker is "economically dependent" on the hiring entity. Id. at 439. The "suffer or permit to work" standard remained in the H-2A regulations from 1987 through the end of 2008.

## D.    H-2A Regulations from 2009 to the Present

In 2009, the DOL amended the H-2A regulations to adopt the common law meaning of an employer-employee relationship.[8] 20 C.F.R. § 655.100(c) (2009). In its 2008 notice of proposed rulemaking and request for comments pertaining to the forthcoming 2009 amendment, the DOL explained that it was proposing a new definition of the employer-employee relationship as a clarification and to avoid confusion that may exist for employers with obligations under the FLSA, the AWPA, and the H-2A program. 73 Fed. Reg. 8538-01 (Feb. 13, 2008). The DOL advised that the new definition would "conform[] to the Supreme Court's holding in Nationwide Mutual Insurance v. Darden, 503 U.S. 318, 322-324 (1992)." Id. (case name not underlined in original). The 2009 version provided that

---

[8]The DOL proposed and approved this new regulatory definition in 2008, but the changes did not take effect until January 2009. We refer to this new definition as the 2009 version.

21

"[e]mployee means employee as defined under the general common law of agency."  20 C.F.R. § 655.100(c) (2009).  The 2009 regulation further outlined these common law factors relevant to determining employer-employee status:

> [T]he hiring party's right to control the manner and means by which the work is accomplished; the skill required to perform the work; the source of the instrumentalities and tools for accomplishing the work; the location of the work; the hiring party's discretion over when and how long to work; and whether the work is part of the regular business of the hiring party.

Id.[9]  The 2009 regulation noted that other factors may be considered and that no one factor is dispositive.  Id.  "Joint employment" is defined in the 2009 regulation to include any entity with "sufficient definitional indicia of employment to be considered the employer of an employee."  Id.  The factors adopted in the DOL's 2009 regulation are consistent with the general common law principles of agency, which apply when Congress uses a common term but does not otherwise clearly define it.  See Darden, 503 U.S. at 323-24, 112 S. Ct. at 1348-49.

At least with respect to all H-2A contracts effective in 2009 and later, it is clear that the DOL intended for the common law principles of agency to govern whether an entity is liable as an employer or joint employer.  The lingering question is whether the common law principles should also govern the joint

---

[9]Under the current regulations, this definition appears in 20 C.F.R. § 655.103(b).  The current definition is almost identical to the 2009 version.

22

employment question for purposes of the H-2A program for the harvest seasons prior to 2009.

### III. BREACH OF CONTRACT CLAIMS

Given this background, the central issue on appeal is what legal standard—the common law principles of agency or the DOL regulations—govern whether Consolidated Citrus was a joint employer under the H-2A program for purposes of the plaintiffs' breach of contract claims involving the 2007-08 and 2008-09 harvest seasons.[10]

### A.    **Darden and Step One of Chevron Deference**

Our consideration here is guided by the Chevron framework, which helps us determine whether the administrative action in question is entitled to deference on judicial review.  See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-44, 104 S. Ct. 2778, 2781-82 (1984).  Under that approach, when reviewing an agency's interpretation of a statute, we first ask whether "Congress has directly spoken to the precise question at issue."  Id. at 842, 104 S. Ct. at 2781. If we answer that question in the affirmative, and the Congressional directive is clear, we must "give effect to the unambiguously expressed intent of Congress." Id. at 843, 104 S. Ct. at 2781.  But where the Congressional directive is ambiguous or otherwise unclear, we ask whether the agency's interpretation of the issue "is

---

[10]We summarily reject the plaintiffs' claim that Consolidated Citrus did not adequately preserve the issues raised on appeal.

based on a permissible construction of the statute." Id. at 843, 104 S. Ct. at 2781-82.

The agency action at issue here is the DOL's 1987 rulemaking, in which the DOL adopted the "suffer or permit to work" standard for determining employer-employee status under the H-2A program. Our Chevron analysis of this rule ends at step one. A review of the statutory language and the other legislation in existence at the time of the passage of the IRCA amendments to the INA reveals that Congress intended for the common law principles of agency to govern the statutory term "employer" for purposes of the H-2A statute in the IRCA amendments. Because Congress has directly spoken to the issue, the 1987 DOL regulation is not entitled to deference.

We begin with the statutory language in the INA as amended by the IRCA. As noted earlier, the H-2A statutory provisions in the IRCA amendments, which are now codified as part of the INA, use the term "employer" numerous times without explicitly defining that term. See, e.g., 8 U.S.C. § 1188. Nonetheless, when we construe a statutory provision, we must read it in context, giving due consideration to the provision's place in the overall legislative scheme. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S. Ct. 1291, 1301 (2000).

24

At the time when Congress enacted the IRCA amendments to the INA, there were two different standards available for defining the employer-employee relationship for purposes of the H-2A program—the FLSA's "suffer or permit to work" approach and the common law principles of agency.  When Congress enacted the AWPA in 1983, it chose to adopt the more expansive "suffer or permit to work" standard, expressly incorporating that standard by reference to the FLSA. When it enacted the IRCA amendments to the INA in 1986, however, Congress did not adopt that FLSA approach.  Instead, Congress chose not to define the common term "employer" in the IRCA amendments at all and thereby chose to rely on the established common law meaning of that term.

The reasoning of Darden confirms that when Congress declined to incorporate the FLSA's statutory "suffer or permit to work" standard in the IRCA amendments to the INA, and instead provided no clear statutory definition of the term "employer," it intended the common law principles of agency to dictate the parameters of the employment relationship under the H-2A program.  See 503 U.S. at 322-24, 112 S. Ct at 1348.  The Supreme Court in Darden did not fashion this common-law-meaning rule of statutory construction from whole cloth.  Darden derived this concept from Reid, which in turn relied on a rule of statutory construction from the Supreme Court's 1981 decision in NLRB v. Amax Coal Co.

25

See Reid, 490 U.S. at 739, 109 S. Ct. at 2172 (quoting NLRB v. Amax Coal Co., 453 U.S. 322, 329, 101 S. Ct. 2789, 2794 (1981)).

In the 1981 Amax Coal decision, which was issued years before Congress enacted the IRCA amendments to the INA, the Supreme Court reiterated the general rule that "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."  453 U.S. at 329, 101 S. Ct. at 2794.  Thus, at the time when Congress enacted the IRCA amendments to the INA, it was well-settled that statutory silence on the meaning of "employer" would trigger statutory interpretation consistent with that term's common law meaning.

Viewed against this background and the FLSA's and the AWPA's statutory "suffer or permit to work" standard, Congress's choice to omit that statutory standard in the IRCA amendments to the INA is significant.  Congress's silence as to the definition of "employer" indicates that Congress intended for that term to be construed in a manner consistent with its common law meaning.[11]  See Darden,

---

[11]When construing the meaning of the statutory language chosen by Congress, "[w]e must respect the compromise embodied in the words" as they are codified.  Mohasco Corp. v. Silver, 447 U.S. 807, 826, 100 S. Ct. 2486, 2497 (1980).  As noted by the amici in this case, the IRCA, which amended the INA to create the current H-2A program, was the product of a careful compromise between advocates for farmers, advocates for workers, and civil rights groups.  The final product did not endorse the "suffer or permit to work" statutory standard for defining employment relationships.  There is also nothing in the legislative history of the IRCA

26

503 U.S. at 322-24, 112 S. Ct. at 1348.  In these circumstances, we must "give effect" to Congress's choice not to graft the FLSA and AWPA standards onto the H-2A program.  See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. __, __, 133 S. Ct. 2517, 2529 (2013) (concluding that Congress acted deliberately when it included certain provisions in parts of Title VII but omitted them elsewhere).

We accordingly do not reach the second step of the Chevron analysis.  Based on Darden's rule of statutory construction and the fact that Congress deliberately did not adopt in the IRCA amendments to the INA the statutory "suffer or permit to work" standard used in the FLSA and the AWPA, we conclude that the common law principles of agency govern the employment inquiry under the H-2A program.  Because under our statutory analysis the common law principles govern here, the 1987 DOL regulation, which adopted the "suffer or permit to work" standard, is not entitled to deference and has "no effect."  See Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1320 (11th Cir. 2011).  Accordingly, the common law standard, and not the "suffer or permit to work" standard adopted in the 1987 DOL regulation, governs the issue of whether Consolidated Citrus qualifies as a joint employer for purposes of the plaintiffs' breach of contract claims for all the harvest seasons at issue.

---

amendments to the INA that indicates that the legislators or the stakeholders intended for the "suffer or permit to work" standard to apply.

27

**B.    The Plaintiffs' Arguments**

The plaintiffs advance four arguments in support of their position that the 1987 DOL regulation, which adopted the "suffer or permit to work" standard, provides the governing standard for purposes of determining whether Consolidated Citrus is liable for breach of contract as a joint employer.  In the interest of completeness, we address those arguments below.

First, the plaintiffs contend that applying the common law principles of agency instead of the "suffer or permit to work" standard will thwart the purpose of the H-2A program, which is to allow aliens to work temporarily in the United States without rendering foreign agricultural workers more attractive to employers than domestic agricultural workers.  According to the plaintiffs, applying the narrower common law principles of agency for purposes of the H-2A program while applying the more expansive "suffer or permit to work" definition for purposes of the AWPA would create a two-tiered system of worker protections—a stronger one for domestic workers under the AWPA and a weaker one for foreign workers under the H-2A program.  The plaintiffs argue that applying the narrower common law principles for the H-2A program will limit the entities against which foreign H-2A workers can bring a legal action to vindicate their rights, making foreign workers more attractive to employers.

It is unclear whether Congress contemplated this potential incongruity when it enacted the IRCA amendments to the INA. What is clear, however, is that Congress chose not to adopt the FLSA's or the AWPA's "suffer or permit to work" standard in the IRCA amendments to the INA. The statutory directive of the IRCA amendments is apparent, and we are not free to ignore that directive because of what the plaintiffs perceive to be a shortcoming in legislative policy. See Nassar, 570 U.S. at __, 133 S. Ct. at 2529.

Second, the plaintiffs argue that Darden's rule of statutory construction applies only for purposes of determining whether a worker is an employee or an independent contractor. The plaintiffs are correct that the statutory term at issue in Darden was "employee" rather than "employer" and that the distinction between employees and independent contractors was relevant to the Supreme Court's decision in Darden. 503 U.S. at 323, 328, 112 S. Ct. at 1348, 1350-51. As demonstrated below, however, the reasoning of Darden is not limited in the way that the plaintiffs contend.

The plaintiffs' argument on this point ignores the breadth of the principle announced in Amax Coal and relied on in Reid. It is a generic rule of statutory construction and is in no way tethered to the context of distinguishing independent contractors from employees. See Amax Coal, 453 U.S. at 329, 101 S. Ct. at 2794. That canon of statutory construction provides, in general terms, that any statutory

29

term with established meaning under the common law is to be construed in a manner consistent with that common law meaning unless the statute says otherwise.  Id.  It was this general rule that informed the Supreme Court's decision in Darden.  503 U.S. at 322-23, 112 S. Ct. at 1348.

Furthermore, the Supreme Court has relied on that same broad principle of statutory interpretation to determine the meaning of a different term as used in a different statute, demonstrating that the principle applies for purposes other than merely distinguishing between employees and independent contractors.  See Neder v. United States, 527 U.S. 1, 21-23, 119 S. Ct. 1827, 1840 (1999) (relying on Darden to construe the term "defraud," as used in federal criminal fraud statutes, in a manner consistent with its settled meaning under the common law).  The rule applied in Darden is apposite in this case.

Third, relying on the Supreme Court's decision in NLRB v. Town & Country Electric, Inc., the plaintiffs contend that Darden does not always dictate application of the common law meaning of "employ" and its related variations of "employer" and "employee."   It is true, as the plaintiffs note, that in Town & Country the Supreme Court declined to apply Darden and instead followed the National Labor Relations Board's ("NLRB") interpretation of the term "employee."  516 U.S. 85, 94, 116 S. Ct. 450, 455 (1995).  But that case is materially distinguishable from this case in at least two respects.

30

In Town & Country, the Supreme Court noted that it will defer to an agency interpretation where Congress has delegated authority to the agency to define a term. The Supreme Court concluded that, in the context of the National Labor Relations Act ("NLRA"), it was clear that "the task of defining the term 'employee'" as it is used in the NLRA, "[had] been assigned primarily to the agency." Id. The plaintiffs point to no authority indicating that Congress intended for the DOL to define the term "employer" as it is used in the IRCA in the same way that the NLRB is uniquely tasked with defining the term "employee" as that term is used in the NLRA. See id. at 89-90, 116 S. Ct. at 453 ("[The Supreme Court's] decisions recognize that the [NLRB] often possesses a degree of legal leeway when it interprets its governing statute, particularly where Congress likely intended an understanding of labor relations to guide the [NLRA]'s application.").

More importantly, the Supreme Court noted in Town & Country that the NLRB's definition of "employee" was "consistent with the common law." Id. at 86, 116 S. Ct. at 451. Here, in contrast, the DOL's 1987 definition of "employer" was at odds with the common law's more restrictive approach. Moreover, the DOL ultimately abandoned that 1987 definition in 2009. See 20 C.F.R. § 655.100(c) (2009). In short, Town & Country does not counsel in favor of deferring to the DOL's regulation under Chevron.

31

Fourth, the plaintiffs argue that <u>Darden</u> should not apply here because in that case, "the Supreme Court was not guided by any administrative regulations interpreting the term 'employee.'" This argument turns the <u>Chevron</u> inquiry on its head. The first step of the <u>Chevron</u> analysis is not concerned with the content of the existing regulations. Rather, under <u>Chevron</u>, we must first ask, without reference to the existing regulations, whether Congress has directly spoken to the issue at hand. If it has, we disregard the regulations and effectuate Congress's clear intent. <u>Chevron</u>, 467 U.S. at 842, 104 S. Ct. at 2781.

Thus, the fact that <u>Darden</u> was decided in the absence of implementing regulations does nothing to undermine the Supreme Court's holding in that case regarding the application of settled common law principles of agency in the absence of a clear statutory definition otherwise. With or without consideration of implementing regulations, <u>Darden</u> plainly tells us what Congress meant when it used the term "employer" without providing a statutory definition for that term. Because Congress indicated by its silence that, for purposes of the H-2A provisions of the statute, the common law governed rather than the "suffer or permit to work" standard, our analysis ends at <u>Chevron</u> step one.

In sum, the common law principles of agency are the proper standard for determining whether Consolidated Citrus is liable as a joint employer for breach of the plaintiffs' H-2A work contracts for the 2007-08 and 2008-09 harvest seasons.

32

We thus reverse the decisions below to the extent that the district court applied the "suffer or permit to work" standard to determine whether Consolidated Citrus was a joint employer for purposes of the plaintiffs' breach of contract claims.  We next consider the application of the governing common law standard to the circumstances of this case.

### C.    Common Law Analysis

Under the governing common law standard, the proper focus is the hiring entity's "right to control the manner and means by which the product is accomplished."  Darden, 503 U.S. at 323, 112 S. Ct. at 1348 (internal quotation marks omitted) (quoting Reid, 490 U.S. at 751, 109 S. Ct. at 2178).

The Supreme Court in Darden identified several factors relevant to determining whether an employer-employee relationship exists under the common law principles of agency:  (1) "the skill required;" (2) "the source of the instrumentalities and tools;" (3) "the location of the work;" (4) "the duration of the relationship between the parties;" (5) "whether the hiring party has the right to assign additional projects to the hired party;" (6) "the extent of the hired party's discretion over when and how long to work;" (7) "the method of payment;" (8) "the hired party's role in hiring and paying assistants;" (9) "whether the work is part of the regular business of the hiring party;" (10) "whether the hiring party is in business;" (11) "the provision of employee benefits;" and (12) "the tax treatment

of the hired party."[12]  Id. at 323-24, 112 S. Ct. at 1348.  Though these factors may be instructive, "there is no shorthand formula or magic phrase that can be applied to find the answer" under the common law approach.  NLRB v. United Ins. Co. of Am., 390 U.S. 254, 258, 88 S. Ct. 988, 991 (1968).

Following the bench trial on the FLSA and breach of contract claims, the district court made extensive findings of fact, many of which will be relevant for purposes of conducting the common law analysis for the breach of contract claims. Mem. Op. and Order 2-26, ECF No. 222.  The district court failed, however, to apply the common law principles to decide whether Consolidated Citrus qualifies as a joint employer under the H-2A program and instead decided that issue under the "suffer or permit to work" standard.

Therefore, we remand this case to the district court to decide in the first instance whether, under the common law principles of agency, Consolidated Citrus qualifies as a joint employer for purposes of the plaintiffs' breach of contract claims.  See Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1347-48 (11th Cir. 2005) ("The district court's failure to conduct the proper inquiry requires us to remand this issue . . . ."); Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc., 911 F.2d 1548, 1550 n.3 (11th Cir. 1990) (declining to consider a

---

[12]The common law factors listed in the DOL's 2009 H-2A regulations are consistent with the common law factors listed in Darden.  Compare 20 C.F.R. § 655.100(c) (2009) with Darden, 503 U.S. at 323-24, 112 S. Ct. at 1348.

claim not first decided by the district court). On remand, the district court need not take further evidence or engage in further fact finding. Rather, the district court should apply the proper common law standard to the extensive factual findings in its previous Memorandum Opinion and Order. Mem. Op. and Order 2-26, ECF No. 222.

## IV. FLSA CLAIMS

The final issue is whether Consolidated Citrus qualifies as a joint employer for purposes of the plaintiffs' FLSA claims. The FLSA's statutory "suffer or permit to work" standard is the proper legal standard for making this FLSA determination. Consolidated Citrus maintains, however, that even under the FLSA's expansive "suffer or permit to work" standard, Consolidated Citrus does not qualify as a joint employer.[13]

## A.     Joint Employment Under the "Suffer or Permit to Work" Standard

This Court has identified eight factors to be considered in determining whether an entity qualifies as an employer under the FLSA "suffer or permit to work" standard:[14] (1) "[t]he nature and degree of control of the workers;"

---

[13]As noted earlier, after a bench trial, we review the district court's conclusions of law de novo and findings of fact for clear error. Tartell, 790 F.3d at 1257. Whether an entity qualifies as a joint employer is a question of law. Aimable, 20 F.3d at 440.

[14]The joint employer analysis may apply differently depending on whether the claims at issue arise under the FLSA, the AWPA, or both. See Layton v. DHL Express (USA), Inc., 686 F.3d 1172, 1175-78 (11th Cir. 2012) (discussing the different analyses applicable in the context of FLSA and AWPA claims and the reasons for the doctrinal divergence); see also Charles v.

(2) "[t]he degree of supervision, direct or indirect, of the work;" (3) "[t]he power to determine the pay rates or the methods of payment of the workers;" (4) "[t]he right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;" (5) "[p]reparation of payroll and the payment of wages;" (6) "ownership of facilities where work occurred;" (7) "performance of a specialty job integral to the business;" and (8) "investment in equipment and facilities." Layton v. DHL Express (USA), Inc., 686 F.3d 1172, 1176 (11th Cir. 2012) (citing Aimable, 20 F.3d at 438-44) (noting that, with respect to the eighth factor, the relevant comparison is the amount of investment in equipment and facilities by the land owner versus the contractor). We refer to these factors as the "Aimable factors."

When applying the Aimable factors, courts should heed five overarching principles. First, in joint employer cases, rather than fixating on whether the worker is relatively more dependent on one putative employer than the other, the court should separately focus on the worker's relationships with each putative employer. Layton, 686 F.3d at 1177 (quoting Antenor v. D & S Farms, 88 F.3d 925, 932-33 (11th Cir. 1996)). Second, no one factor is dispositive. Id. Third, the eight factors are useful because they indicate economic dependence. This means

---

Burton, 169 F.3d 1322, 1329 (11th Cir. 1999) (setting out a separate seven-factor test for determining whether an entity is a joint employer under the AWPA and the relevant regulations). We need not discuss the details of the AWPA-related analysis because the parties separately settled the non-H-2A plaintiff's AWPA claims before the district court ruled on Consolidated Citrus's status as a joint employer.

that the weight given to each factor will depend upon the extent to which it is probative of the worker's economic dependence on the putative employer under the circumstances. Id. Fourth, there is no mathematical formula for determining the existence of a joint employment relationship. Evidence germane to the issue of economic dependence should be analyzed holistically and qualitatively. Id. at 1178. Fifth, the common law principles of employment have no bearing on the "suffer or permit to work" analysis. Id.

The ultimate question, when applying these Aimable factors to determine joint employer status under the FLSA "suffer or permit to work" standard, is whether, as a matter of "economic reality," the hired individual is "economically dependent" upon the hiring entity. See Aimable, 20 F.3d at 439.

**B.    The District Court Correctly Applied the Aimable Factors**

As to the plaintiffs' FLSA claims, the district court correctly identified the Aimable factors as the governing standard for determining whether Consolidated Citrus qualifies as a joint employer. After de novo review of the district court's well-reasoned decision and the extensive record in this case, we agree with the district court's legal conclusion that Consolidated Citrus qualifies as a joint employer under the FLSA statutory "suffer or permit to work" standard. We affirm the district court's decision as to this issue.

## V.  CONCLUSION

Based on the foregoing, we affirm in part, reverse in part, and remand this case to the district court for further proceedings consistent with this opinion.  To the extent that the district court held Consolidated Citrus liable as a joint employer for purposes of the plaintiffs' FLSA claims, we affirm.  We reverse, however, the district court's determination that the FLSA "suffer or permit to work" standard applied to the breach of contract claims for purposes of determining whether Consolidated Citrus qualifies as a joint employer under the H-2A program.  The common law principles of agency govern that question.  We remand to the district court to apply, in the first instance, that governing standard for purposes of the plaintiffs' breach of contract claims.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**