[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 9, 2012
JOHN LEY
CLERK

No. 11-12532
_____

D.C. Docket No. 2:08-cv-01542-WMA

LEANDRE LAYTON,
on behalf of himself and all those similarly situated,

Plaintiff - Appellant,

versus

DHL EXPRESS (USA), INC.,

Defendant - Appellee,

SKY LAND EXPRESS, INC., et al.

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(July 9, 2012)

Before EDMONDSON, WILSON, and KRAVITCH, Circuit Judges.

WILSON, Circuit Judge:

Leandre Layton, on behalf of himself and the similarly-situated members of his conditionally-certified class (collectively, "Drivers"), appeals the district court's grant of summary judgment in favor of DHL Express, Inc. ("DHL") on his claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* After a thorough examination of the realities of the economic relationship between Drivers and DHL, we affirm on the grounds that DHL is not a joint employer of Drivers.

## I.

DHL is a provider of shipping and logistic services. In some parts of the country, DHL hires third-party contractors who employ couriers to deliver DHL's packages. Between 2005 and 2009, DHL utilized Sky Land Express, Inc. ("Sky Land") as such a contractor in Alabama. Sky Land worked out of three warehouse locations in the state: Birmingham, Jasper, and Tuscaloosa. The relationship between DHL and Sky Land was governed by a Cartage Agreement that stated that Sky Land was an independent contractor of DHL and specified Sky Land's contractual duties. Drivers were employed by Sky Land and served mainly as delivery couriers, although some also acted as supervisors, dispatchers, and shuttle

drivers. Sky Land owned the vehicles that Drivers used to deliver packages; DHL owned the warehouse facilities and all other equipment.

Every morning, DHL had packages delivered to the Birmingham warehouse. Drivers could not begin work until a DHL employee informed them that those packages had been received and coded and were ready for pick-up. After receiving the go-ahead, Drivers sorted, scanned, and loaded the packages. Sky Land leased the necessary scanners from DHL. As Drivers loaded their vehicles at the warehouse, a DHL employee would often inspect Drivers' vehicles and uniforms to ensure that they conformed to the standards specified in the Cartage Agreement. The uniforms and the vehicles bore the names of both DHL and Sky Land.

Drivers delivered some packages straight from the Birmingham warehouse to customers; the rest of the packages were shuttled to the Tuscaloosa and Jasper warehouses, retrieved by Drivers, and then delivered. Drivers spent the majority of their days making pick-ups and deliveries in their vehicles. Throughout the day, DHL sent information regarding customer complaints, requests for re-deliveries, and other non-routine matters to Drivers. As Drivers worked, they used the scanners to log the time at which each package was picked up or delivered. When Drivers had completed their delivery routes for the day, they unloaded any

remaining packages at one of the warehouses and returned their scanners to be charged overnight. At that time, the information that the scanner had collected during the day about package locations was transmitted to a DHL data server.

On August 27, 2008, Layton filed a collective action under the FLSA for unpaid overtime compensation, naming DHL, Sky Land, and Gary Littlefield, the owner and president of Sky Land, as his joint employers and defendants to the suit. On June 22, 2009, the district court granted Layton conditional collective-action certification pursuant to 29 U.S.C. § 216(b). The conditionally-certified class included forty-nine delivery drivers who had worked for Sky Land in Alabama; the class period was June 22, 2006 through June 22, 2009.[1]

On October 22, 2010, DHL moved for summary judgment on the ground that it was not an employer of Drivers. On November 5, 2010, Sky Land and Littlefield moved for summary judgment, claiming that (1) the FLSA's Motor Carrier Act Exemption ("MCE") made Drivers ineligible for overtime compensation and (2) one member of the conditionally-certified class fell within the executive exemption to the FLSA. On November 16, 2010, DHL filed an untimely motion to join and adopt Sky Land and Littlefield's motion. On

_____

[1] An additional twenty-five persons have since opted-in to join the action as members of the conditionally-certified class.

4

December 3, 2010, Layton, Sky Land, and Littlefield jointly moved to dismiss Sky Land and Littlefield as defendants. Three days later, the district court granted the motion, dismissed Sky Land and Littlefield and ordered their motion withdrawn, and denied DHL's motion to adopt. On January 12, 2011, the district court denied DHL's motion for summary judgment. Then, on February 15, 2011, the district court *sua sponte* vacated its order denying DHL's request to join Sky Land and Littlefield's motion to dismiss. Subsequently, on May 3, 2011, the district court granted summary judgment for DHL, finding that (1) the "dismissal of Sky Land effectively eliminated [Plaintiff class members'] claim against DHL" and (2) Plaintiff class members fell within the MCE and were thus not able to assert overtime pay claims. The district court later amended the order to add an additional reason for granting the motion:

> DHL did everything it could possibly do to relate to Sky Land only as an "independent contractor[."] The contract with Sky Land allowed DHL to exercise only the minimal supervision necessary to monitor compliance with the contract. The undisputed facts lead to the conclusion that if plaintiffs were employed by anybody, they were employed by Sky Land, the entity that they ostentatiously dismissed as a defendant, for reasons this court can only guess at. DHL was not an employer, much less a joint employer.

Layton now appeals the district court's grant of summary judgment.

## II.

We review *de novo* a district court's grant of summary judgment. *Vector*

5

*Prods., Inc. v. Hartford Fire Ins. Co.*, 397 F.3d 1316, 1318 (11th Cir. 2005) (per curiam). We can affirm a grant of summary judgment on grounds other than those relied upon by the district court. *Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350, 1354 (11th Cir. 2009). In reviewing a grant of summary judgment, we resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor. *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000). Therefore, throughout this opinion we have presented all evidence in the light most favorable to Layton.

III.

The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). An entity "employs" a person under the FLSA if it "suffer[s] or permit[s]" the individual to work. *Id.* § 203(g). In order to determine whether an alleged employer "suffer[s] or permit[s]" an individual to work, we ask "if, as a matter of economic reality, the individual is dependent on the entity." *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33, 81 S. Ct. 933, 936–37 (1961)). An employee may have more than one employer, and "whether the employment by the employers is to be considered joint employment or separate and distinct employment for

6

purposes of the act depends upon all the facts in the particular case." 29 C.F.R. §

791.2(a).  A joint-employment relationship will generally be found to exist in

situations such as:

> (1) Where there is an arrangement between the employers to share the
> employee's services, as, for example, to interchange employees; or
> (2) Where one employer is acting directly or indirectly in the interest
> of the other employer (or employers) in relation to the employee; or
> (3) Where the employers are not completely disassociated with
> respect to the employment of a particular employee and may be
> deemed to share control of the employee, directly or indirectly, by
> reason of the fact that one employer controls, is controlled by, or is
> under common control with the other employer.

*Id.* § 791.2(b) (footnotes omitted).

In this circuit, many joint-employment FLSA claims have arisen in cases

also asserting a joint-employment relationship under the Migrant and Seasonal

Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801 *et seq.*  Because

the AWPA defines the term "employ" by reference to the FLSA and because the

AWPA regulations provide more detailed guidance regarding the definition of

joint employer, much of our caselaw expanding upon the definition of joint

employment has relied upon the AWPA regulations.

For example, in *Aimable v. Long & Scott Farms*, a farm labor contractor

recruited migrant farm workers to harvest crops for a property owner.  20 F.3d

434, 437 (11th Cir. 1994).  The farm workers then brought FLSA and AWPA

claims against both the contractor and the property owner as joint employers. *Id.*
at 437. The district court determined that the contractor was, in fact, an employer,
and the only question on appeal was whether the property owner was also an
employer. *Id.* In evaluating the existence of an employment relationship, we
looked at eight factors. We drew the first five factors from regulations relating to
the AWPA:

> [1] The nature and degree of control of the workers;
> [2] The degree of supervision, direct or indirect, of the work;
> [3] The power to determine the pay rates or the methods of payment
> of the workers;
> [4] The right, directly or indirectly, to hire, fire, or modify the
> employment conditions of the workers;
> [5] Preparation of payroll and the payment of wages.

*See id.* at 438 (quoting 29 C.F.R. § 500.20(h)(4)(ii)).[2] We derived factors six and
seven from caselaw: (6) ownership of the facilities where work occurred, and (7)
performance of a specialty job integral to the business. *See id.* at 439, 444
(drawing upon *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S. Ct. 1473
(1947) ("*Rutherford*") and *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d
235 (5th Cir. 1973)). A final factor—investment in equipment and facilities—we
deemed irrelevant if one were comparing the investment by the workers versus the

---

[2] Judge Easterbrook has described the AWPA regulations as "offer[ing] a way to think
about the subject [of joint employment] and not an algorithm." *Reyes v. Remington Hybrid Seed
Co.*, 495 F.3d 403, 408 (7th Cir. 2007).

land owner. *Id.* at 443. However, we did find it worthwhile to evaluate the relative investments of the land owner and the *contractor* because such an analysis might shed light on whether the workers were economically dependent on the land owner. *Id.* When discussing *Aimable* in a subsequent case, we definitively stated that the investments of the purported employer and the contractor should be considered as the eighth factor of the joint-employment test. *Antenor*, 88 F.3d at 937.

In *Aimable*, we also found three factors to be irrelevant to our analysis: (1) the opportunity for profit and loss, (2) permanency and exclusivity of employment, and (3) the degree of skill required to perform the job. 20 F.3d at 443–44. We explained that these three factors only distinguished whether one was an employee or an independent contractor. *See id.* Because it had been determined that the farm workers were employees of the contractor, there was no need to evaluate whether hallmarks of an independent-contractor relationship existed. *See id.*

In 1997, the Department of Labor amended the AWPA regulations to further clarify the definition of joint employment under the AWPA. Following the amendments, we were confronted with AWPA claims in *Charles v. Burton*, 169 F.3d 1322 (11th Cir. 1999) (per curiam), and we adapted the eight-factor test laid out in *Aimable* to reflect the new guidance offered by the regulations. *See, e.g.,*

169 F.3d at 1332 ("[T]he *Aimable* court found that an analysis of this factor fails to aid in this determination. We, however, choose to analyze this factor, since it is included in the AWPA's regulations." (internal citations omitted)). *Charles*, incorporating the amendments to the AWPA regulations, set out a seven-factor test for evaluating whether an employment relationship exists:

> (1) whether the agricultural employer has the power, either alone or through the FLC [farm labor contractor], to direct, control or supervise the workers or the work performed (such control may be either direct or indirect, taking into account the nature of the work performed and a reasonable degree of contract performance oversight and coordination with third parties); (2) whether the agricultural employer has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the workers; (3) the degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue; (4) the extent to which the services that the workers rendered are repetitive, rote tasks requiring skills that are acquired with relatively little training; (5) whether the activities that the workers performed are an integral part of the overall business operation of the agricultural employer; (6) whether the work is performed on the agricultural employer's premises, rather than on premises that another business entity owns or controls; and (7) whether the agricultural employer undertakes responsibilities in relation to the workers that employers commonly perform, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

169 F.3d at 1329. In fashioning this test, some of the *Aimable* factors were

combined and new factors were added.

Layton urges us to consider all the factors stated in *Charles*, including those that were not laid out in *Aimable*. We decline that invitation. The court in *Charles* was considering only AWPA claims, not FLSA claims; therefore, *Charles* does not dictate the factors we must utilize in our evaluation of FLSA claims.[3] Although the AWPA defines joint employment by reference to the definition provided in the FLSA, that does not mean that the reverse holds true—that joint employment under the FLSA is invariably defined by AWPA regulations. Because *Aimable* crafted a definition of "joint employer" that applied to both AWPA and FLSA claims and that test has not been disrupted by a case involving FLSA claims or amendments to the FLSA, we must follow the eight-factor test of *Aimable*.

In applying the eight-factor test, we are guided by a number of principles:

First, the question in "joint employment" cases is not whether the worker is more economically dependent on the independent contractor or the [alleged employer], with the winner avoiding responsibility as an employer. . . . [T]he focus of each inquiry must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer.

Second, no one factor is determinative. As we explained in *Aimable*,

_____

[3] Although *Charles*'s joint-employment test is not binding precedent here, we reference *Charles* and its progeny as persuasive authority to the extent that those cases help us apply the eight factors of *Aimable*.

11

the existence of a joint employment relationship depends on the economic reality of all the circumstances.

Third, the factors are used because they are indicators of economic dependence. They are aids—tools to be used to gauge the degree of dependence of alleged employees on the business to which they are connected. . . . Thus, the weight of each factor depends on the light it sheds on the []workers' economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case.

Fourth, a joint employment relationship is not determined by a mathematical formula. . . . The purpose of weighing the factors is not to place each in either the contractor or the [alleged employer's] column, but to view them qualitatively to assess the evidence of economic dependence, which may point to both.

Fifth, in considering a joint-employment relationship, we must not allow common-law concepts of employment to distract our focus from economic dependency.

*Antenor*, 88 F.3d at 932–33 (quotation marks and citations omitted).

## IV.

## A.

We now turn to examine the economic realities of the relationship between DHL and Drivers, using the eight factors of *Aimable* as a guide.

1. The nature and degree of DHL's control of Drivers

"Control arises . . . when the [purported joint employer] goes beyond general instructions . . . and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." *Aimable*,

12

20 F.3d at 441 (explaining that although an agricultural company's decisions about what to plant and how much land to use showed "abstract" control over farm workers, that type of control did not constitute control for FLSA purposes). A purported employer takes an overly active role in the oversight of work "when it decides such things as (1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained." *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209–10 (11th Cir. 2003) (quotation marks and citation omitted) (discussing "nature and degree of control" factor as set forth in *Aimable*). When assessing the nature and degree of control, our "focus is more properly limited to specific indicia of control." *Aimable*, 20 F.3d at 440.

Layton makes much of the fact that DHL made business decisions that directly impacted the length of Drivers' workdays, arguing that DHL *de facto* controlled Drivers' hours. For example, DHL dictated what time the packages were available for pick-up each morning, thereby limiting how early Drivers' workdays could begin. Additionally, DHL occasionally had erratic pick-up orders to which Drivers had to respond, resulting in Drivers working longer hours. However, we find this indirect type of control to be more akin to the "abstract"

13

control present in *Aimable* than the type of control exercised by an employer. DHL may have incidentally impacted Drivers' working conditions, but we do not find that DHL's conduct evidenced an "overly active" role in the oversight of Drivers. DHL had certain objectives—having its packages delivered on time, serving its customers—that Sky Land, and therefore Drivers, were tasked with accomplishing. DHL did not involve itself with the specifics of how those goals would be reached—it did not apportion tasks to individuals, specify how many individuals should be assigned to each delivery route, or structure the chain of command among Drivers. Overall, this factor weighs against a finding of joint employment because DHL did not exert control as an employer would have.

2. DHL's degree of supervision, direct or indirect, of Drivers' work

Supervision can be present regardless of whether orders are communicated directly to the alleged employee or indirectly through the contractor. *Aimable*, 20 F.3d at 441. "[I]nfrequent assertions of minimal oversight do not constitute the requisite degree of supervision." *Martinez-Mendoza*, 340 F.3d at 1211 (discussing "degree of supervision" factor set forth in *Aimable*).

Drivers spent the majority of their days by themselves in their trucks, away from DHL facilities and DHL employees. However, Layton contends that DHL still supervised them in a number of ways. First, Drivers were responsible for

14

loading packages onto their trucks at DHL's warehouse, and DHL managers oversaw that process, at times criticizing Appellants' loading techniques. Second, DHL audited Drivers' vehicles and uniforms to ensure that they complied with the standards stated in the Cartage Agreement. Third, DHL communicated with Drivers via the scanners if a non-routine situation occurred and Drivers were needed to re-deliver a package or respond to a customer complaint submitted to DHL. We agree that these actions evidence a small amount of supervision. However, we disagree with Layton's contention that DHL "supervised" Drivers because the scanners collected information about package locations; we do not think that this type of data collection equates to employer-like supervision. The scanners did not stream information to DHL in a way that would simulate the real-time monitoring of an actual supervisor. Instead, the scanners sent aggregate information to DHL's data server at the close of the day. Furthermore, the scanners only provided data about package location. Although such information indirectly commented on Drivers' work—delivery speed is a metric that could be relevant to evaluating a delivery driver's performance—this type of monitoring is dissimilar from standard employer supervision and has little probative value for the purposes of determining joint employment. As we stated above, DHL engaged in a limited amount of monitoring at the warehouse, but Drivers were basically

15

unsupervised while completing their most essential job function which took up the majority of the workday—making deliveries. Overall, this factor is not strongly probative of joint employment.

3. DHL's right, directly or indirectly, to hire, fire, or modify Drivers' employment conditions

DHL's only involvement with Sky Land's hiring process was that DHL stipulated in the Cartage Agreement that all persons hired to deliver DHL packages had to pass a basic background check. DHL did not participate in the actual hiring or firing of any employees. Furthermore, the only way in which DHL modified Drivers' employment conditions was by making business decisions that impacted Drivers' hours, as discussed above. *See Antenor*, 88 F.3d at 935 (finding relevant the ability to dictate when the workday begins in examining whether one has the right to modify workers' hours). Because DHL had minimal involvement with the employment process, this factor weighs against a finding of joint employment.

4. DHL's power to set Drivers' pay rates or payment methods

Layton concedes that DHL had no power to set Drivers' pay rates or payment methods; Sky Land alone had this ability. Therefore, this factor weighs against a finding of joint employment.

### 5. DHL's preparation of payroll and payment of the Drivers' wages

Layton admits that this factor also favors DHL because DHL was never involved with the payment of Drivers. Sky Land independently dealt with its payment obligations to Drivers. This factor weighs against a finding of joint employment.

### 6. DHL's ownership of the facilities where the work occurred

We stated in *Antenor* that ownership of the farm laborers' worksite was relevant to our inquiry because "without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors." 88 F.3d at 937. In the instant case, Drivers spent a small part of their days sorting, scanning, and loading packages in warehouses owned by DHL. However, Drivers worked the vast majority of the time in delivery vans owned by Sky Land.

Layton argues that it is relevant to the "ownership" determination that DHL paid Sky Land a stipend of $38 per day to cover maintenance, fuel, and insurance costs of the vehicles. We must disagree under the facts of this case and in light of the purposes of this test. Ownership is relevant because a landowner is thought to have some knowledge of and control over what happens on his land. *See id.* It is

17

not clear how paying Sky Land a stipend could enhance DHL's ability to prevent labor law violations. *See id.* Ownership is also relevant as an indicator of economic independence. *See id.* The fact that Sky Land owned the vans—regardless of whether fuel and maintenance costs were reimbursed—demonstrates that Sky Land, and thus Drivers, could have worked as couriers for other companies. Because Drivers were not dependent on DHL to provide vans so that they could accomplish their core duty—delivering packages—we find that this factor weighs against a finding of joint employment.

7. Drivers' performance of a specialty job integral to the business

This factor is derived from *Rutherford*, in which the Supreme Court found that meat boners recruited by a labor contractor to work at a slaughterhouse were, under the FLSA, joint employees of the slaughterhouse. 331 U.S. at 729, 67 S. Ct. at 1476. Although the workers brought their own tools and were labeled as independent contractors, *see id.* at 724–25, 67 S. Ct. at 1474, the Court focused on the fact that the workers completed one process in the middle of a series of interdependent steps at the slaughterhouse. The facts led the Court to conclude that the workers "did a specialty job on the production line" that was "more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor." *Id.* at 730,

67 S. Ct. at 1477. Because the workers were "part of the integrated unit of production" of the slaughterhouse, the Court found them to be employees of the establishment. *Id.* at 729, 67 S. Ct. at 1476.

We explained in *Antenor* that "a worker who performs a routine task that is a normal and integral phase of the [alleged employer]'s production is likely to be dependent on the [alleged employer]'s overall production process." 88 F.3d at 937. Here, Drivers certainly performed a crucial task for DHL. Yet we are hesitant to say that their role was "analogous to employees working at a particular position on a larger production line." *Id.* (discussing similarities between meat boners in *Rutherford* and crop pickers participating in farm operations). Drivers performed most of their work away from DHL's facilities and supervision; they did not work side-by-side with other DHL employees. Drivers also operated vehicles not owned by DHL, and they were not contractually restricted from using those vehicles to serve other companies needing delivery services. On balance, we find that this factor does not strongly support a conclusion that a joint-employment relationship exists.

8. DHL's and Sky Land's relative investment in equipment and facilities

We consider this factor because workers are more likely to be economically dependent on the person who supplies the equipment or the facilities. *Id.* Here,

19

Sky Land owned the delivery vans. DHL owned the warehouses where packages were received and stored, as well as all other equipment that Drivers used. Because both Sky Land and DHL made significant investments in facilities and equipment, this factor does not aid our joint-employment inquiry. *See Aimable*, 20 F.3d at 443 (stating that because alleged employer and labor contractor both made investments, this factor neither exonerated the purported employer nor demonstrated that employees were dependent on employment).

B.

We believe it worthwhile to reiterate that the eight factors of *Aimable* are only useful to us to the extent that they shed light on the existence of economic dependence. *See Antenor*, 88 F.3d at 929. Our undertaking is oriented by the desire to discover the economic reality of the total circumstances, and the eight-factor test is merely a template for reaching that goal—a template more useful in certain cases than in others. Here, DHL bore no financial or managerial responsibility for Drivers. For the most part, DHL simply tasked Sky Land, and thus Drivers, with macro-level goals—deliver the packages, respond to customer complaints—and provided little guidance regarding the manner by which to execute daily tasks. Sky Land alone held the power to hire, fire, and pay Drivers. Sky Land alone owned the vans that allowed Drivers to complete their essential

job function, and because Sky Land's contract with DHL was not exclusive, Sky Land could have served other companies using those vehicles. We find that the totality of the economic circumstances indicates that Drivers were not economically dependent upon DHL, and we therefore affirm the district court on the grounds that DHL was not a joint employer of Drivers.

**AFFIRMED.**