[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11027

Non-Argument Calendar

_____

JOSE J. AYALA, JR.,
JEFF SANTOS,
on behalf of themselves and as representatives
of other class members similarly situated,

                                        Plaintiffs-Appellants,

*versus*

NISSAN NORTH AMERICA, INC.,
a California corporation, and wholly owned
subsidiary of Nissan Motor Company of Japan,
d.b.a. Nissan USA,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-01625-RBD-RMN

_____

Before WILSON, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

Jose Ayala and Jeff Santos ("Technicians") appeal the district court's denial of their motions for class certification and FLSA collective action and its grant of the Nissan North America's ("Nissan") motion for summary judgment in this Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, case. On appeal, the Technicians argue that the district court erred in granting summary judgment because it failed to consider all admissible record evidence that they presented. They also argue that the court erred in denying their motions for collective action[1] and class certification.

We review the grant of summary judgment de novo, applying the same legal standards as the district court. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010). Summary judgment is proper if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is

---

[1] The FLSA authorizes collective actions against employers accused of violating the FLSA. 29 U.S.C.A. § 216(b).

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. We review a district court's § 216(b) certification for abuse of discretion. *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008). We review the denial of class certification under Rule 23 for abuse of discretion, reviewing factual determinations for clear error and legal determinations de novo. *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1300 (11th Cir. 2021).

We write only for the parties who are already familiar with the facts. Accordingly, we include only such facts as are necessary to understand our opinion. Briefly, the Technicians filed suit against Nissan, alleging violations of the FLSA and the Florida Minimum Wage Act ("FMWA"), Fla. Stat. § 448.110, for failure to pay wages as required by law. They also sought treatment as a collective action pursuant to the FLSA and as a Class Action pursuant to Federal Rule of Civil Procedure 23.

Technicians were automotive service employees working at Florida Nissan dealerships, where they allege they performed vehicle repair and maintenance on behalf of Nissan but allegedly were not compensated as required by law. Specifically, they point to Nissan's Assurance Products Resource Manual ("APRM") and Dealership Agreements which determine how much Nissan will pay dealerships for warranty work conducted by technicians,

regardless of how long the work takes.  Pursuant to the APRM and the Dealership Agreements, Nissan agrees with each dealership to reimburse the dealership according to the "flat-rate" system.  Under those contractual arrangements, Nissan and each dealership agree upon an "approved labor rate" (negotiated with each dealership).  Nissan determines how long each specific repair service usually takes, the "flat-rate time."  Nissan agrees with each dealership to reimburse the dealership for warranty work by multiplying the "flat-rate time" by the "approved labor rate."  The Technicians argue that—when the warranty work takes longer than the "flat-rate time" determined by Nissan, thus limiting Nissan's reimbursement to the dealership—the result is that they are underpaid by the dealership.  The Technicians argue that Nissan is a joint employer, along with each technicians' dealership, and thus are also liable for violations of the FLSA.

Nissan argues, and the district court agreed, that it is not the joint employer along with the respective dealerships, and thus it has no liability for any FLSA violations that might have resulted from the dealerships' independent decisions with respect to wage payments to their employees, the Technicians.  We address first this dispositive issue with respect to the Technicians' challenge to the district court's summary judgment ruling, and then their challenge to the district court's denial of their motions for collective action and class certification.

## I. Discussion

*A. Joint Employer*

The Fair Labor Standards Act provides that an employer is "any person acting directly or indirectly in the interest of an employer in relation to an employee," and that an entity is an employer if it "suffer[s] or permit[s]" a person to work. 29 U.S.C. § 203(d), (g). To determine whether an entity is an employer "we ask if, as a matter of economic reality, the individual is dependent on the entity." *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1175 (11th Cir. 2012) (internal quotation marks omitted). Under the FLSA, a person may have more than one employer as a matter of economic reality. *Id.* Whether there is "joint employment . . . depends upon all the facts in the particular case." *Id.* (internal quotation marks omitted). We have developed an eight-factor test that is guided by five principles for evaluating whether an employment relationship exists under the Act. *Id.* at 1176–77.

Those five principles that have guided our use of the factors are as follows. "First, the question . . . is not whether the worker is more economically dependent on the independent contractor or the alleged employer with the winner avoiding responsibility as an employer;" rather, "the focus . . . must be on each employment relationship . . . between the worker and the . . . asserted . . . joint employer." *Id.* at 1177 (internal quotation marks omitted) (alteration adopted). Second, no factor controls the outcome. *Id.* Third, because the factors "are indicators of economic dependence[,] . . . the weight of each factor depends on" how probative the factor is of the worker's economic dependence on the asserted joint employer. *Id.* (internal quotation marks omitted). Fourth, we do not tally the factors up in a "mathematical formula" to determine the

outcome. *Id.* at 1178 (internal quotation marks omitted). Rather, "[t]he purpose of weighing the factors is not to place each in either the contractor or the [alleged employer's] column, but to view them qualitatively to assess the evidence of economic dependence, which may point to both." *Id.* at 1176. Fifth, we must focus on economic dependence and not the common law of employment. *Id.* at 1178.

With those principles in mind, we turn to the eight factors. First, we look to "[t]he nature and degree of control of the workers." *Id.* at 1176 (internal quotation marks omitted). Second, we evaluate "[t]he degree of supervision, direct or indirect, of the work." *Id.* (internal quotation marks omitted). Third, we examine "[t]he power to determine the pay rates or the methods of payment of the workers." *Id.* (internal quotation marks omitted). Fourth, we determine whether the asserted joint employer has "[t]he right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers." *Id.* (internal quotation marks omitted). Fifth, we consider whether the asserted joint employer "[p]repar[es] [the] payroll and . . . payment of wages." *Id.* (internal quotation marks omitted). Sixth, we consider the "ownership of the facilities where work occurred." *Id.* Seventh, we consider whether the worker "perform[s] . . . a specialty job integral to the [asserted joint employer's] business." *Id.* Finally, we "evaluate the relative investments" of the asserted joint employer "in equipment and facilities" used by the workers. *Id.*

23-11027                 Opinion of the Court                          7

The Technicians argue that the district court erred by failing to consider evidence they submitted.   While the court is required to consider all of the evidence submitted, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.   Accordingly, we look to their arguments on each factor to assess whether the district court did indeed fail to consider the evidence.

As a preliminary matter,   we note that the district court is not required to parse the record "'to search out facts or evidence not brought to the court's attention.'" *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1314 (11th Cir. 2014) (quoting *Atlanta Gas Light Co. v. UGI Utils., Inc.*, 463 F.3d 1201, 1208 n. 11 (11th Cir. 2006)).   In this case, in their brief before this court, the Technicians cited the entire APRM (233 pages), Santos' declaration (22 pages), and Ayala's declaration (21 pages) without pinpoint cites to support their argument on Factor One; we note that they did the same below. *See, e.g.*, Doc. 154 at 11, citing 6 extensive exhibits without pinpoint cites.   Repeatedly throughout the Technicians' initial brief, they refer to the APRM or other such documents as containing evidence that the district court failed to consider, but they have failed to identify the substantive content thereof.   In other words, with very few exceptions, the Technicians have not identified any actual substantive evidence that they assert the district court failed to consider.   And, as noted above, neither the district court nor this Court is required to search these documents to find some favorable evidence for the Technicians.   Indeed, we suspect that they have

identified for us the very few favorable items of evidence; our brief review of the documents supports this.

As mentioned above, there were very few exceptions—i.e. the Technicians' brief does identify a few items of substantive evidence that were allegedly ignored by the district court. However, our careful review of that brief reveals that the very few items of substantive evidence allegedly ignored that were specifically identified in that brief were actually recognized explicitly by the district court—e.g. that the APRM did require "that mechanics clock on to one project at a time for warranty work," Dist. Ct. Doc. 194 at 4; and did "require mechanics to be certified," *id.* at 5. Moreover, contrary to the Technicians' conclusory assertion that the district court did not consider the APRM or Dealership Agreements, the district court expressly recognized the "gravamen" of the Technicians' argument as Nissan's "flat-rate system." *Id.* at 6. The district court explained that system, and explained that it determines Nissan's reimbursement to the dealership—not what the dealership pays its employee, the Technician. The district court explained: "The amount Nissan pays a dealer for a particular repair is separate from what the dealer pays the mechanics; indeed, Nissan typically pays dealers over $100 an hour for warranty work but dealers only pay the mechanics between $14 and $30 an hour." *Id.*

For these reasons, we reject as wholly without merit the Technicians' primary argument on appeal—i.e. that the district court failed to consider relevant evidence. Nevertheless, we

23-11027               Opinion of the Court                    9

proceed to analyze the eight factors for evaluating the joint em-
ployer issue.

The Technicians also argue that the district court improp-
erly weighed the evidence.  However, the weighing of the eight
factors is conducted by the court as a question of law.[2]  As we held
in *Aimable v. Long & Scott Farms*, 20 F.3d 434 (11th Cir. 1994):

> Because the determination of joint employment is a
> question of law, . . . we analyze de novo each of the .
> . . factors to determine which apply to the present
> case as well as to discern the direction in which each
> of the relevant factors points.

---

[2] The Technicians also argue, in conclusory fashion, that the district court re-
solved credibility issues and failed to recognize that there were genuine issues
of material fact that should have precluded summary judgment.  We reject
this argument as wholly without merit.  In their brief to this Court, the Tech-
nicians again fail to identify any subsidiary fact relied upon by the district court
which is disputed; although they assert in conclusory fashion that there are
such disputed facts, they fail to identify them or explain how and why they are
disputed.  Also, they fail to identify any subsidiary fact relied upon by the dis-
trict court which they challenge as clearly erroneous.  Because the relevant
subsidiary facts in this case are largely contained in written documents, like
the APRM and the Dealership Agreements, they are undisputed.  As noted,
the Technicians point to no subsidiary fact, drawn by the district court from
such written documents or otherwise, which is either disputed or clearly erro-
neous.

And, as noted above, the actual weighing of the factors—such as the nature
and degree of control exercised by the alleged joint employer over the techni-
cians—is a question of law for the court to decide.

10                    Opinion of the Court                    23-11027

20 F.3d at 440 (internal citation omitted).  We proceed now to weigh the eight factors.  As stated above, the eight-factor test is not a mathematical formula; rather the court is to weigh the factors to assess the evidence of economic dependence.  *Layton*, 686 F.3d at 1178.  We repeat: in the context of the joint employer test, we have held that the weighing of the factors in the summary judgment context is a question of law.  *See, e.g., Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1204 (11th Cir. 2003); *Aimable*, 20 F.3d at 436; *accord Layton*, 686 F.3d at 1175;

  1. The nature and degree of control of the workers

We have stated that "[c]ontrol arises . . . when the [purported joint employer] goes beyond general instructions . . . and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of work." *Aimable*, 20 F.3d at 441.  "[A]n overly active role in the oversight of work" occurs when an entity makes decisions like "(1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained." *Layton*, 686 F.3d at 1178 (quoting *Martinez-Mendoza*, 340 F.3d at 1209–10).

In *Layton*, we rejected the appellant's evidence of control of the workers' days as being abstract control, not the sort of control exercised by an employer.  *Id.*  Specifically, Layton argued that DHL "dictated what time the packages were available for pick-up each morning, thereby limiting how early Drivers' workdays could

begin." *Id.* Further, "DHL occasionally had erratic pick-up orders to which Drivers had to respond, resulting in Drivers working longer hours." *Id.* DHL employees also would often inspect the drivers' vehicles and uniforms to ensure that they conformed to the standards specified. *Id.* at 1174. We reasoned that DHL had certain objectives that the employer and its drivers were tasked with accomplishing but "it did not apportion tasks to individuals, specify how many individuals should be assigned to each delivery route, or structure the chain of command among Drivers." *Id.* at 1178.

In *Amiable*, the employees pointed to the putative employer's decision making as evidence of control. Specifically, the alleged employer decided which crops to grow, how much to plant, and how to grow the plants as well as when and which fields to harvest; these decisions determined how much work was available and how many workers thus needed. We rejected this evidence because factor one is "properly limited to specific indicia of control." 20 F.3d at 440. The alleged employer did not directly control the number of employees, hire or fire employees, or select specific employees for certain jobs. *Id.*

For the first factor, the Technicians point to several of their filings below where they cited Nissan's APRM, which outlines the technicians' requirements when completing a work order, directs the number of vehicles that a technician may work on, and specifies the requirements for claimed work to be paid. The Technicians also point to Nissan's Anomalous Repair Control program, whereby Nissan could identify specific technicians that performed

any anomalous repairs and "seek to provide corrective measures to prevent any future anomalous repairs," as evidence of Nissan's control.  Doc. 153 at 11.

Citing depositions and declarations that discussed the APRM, the district court found that this factor weighed in favor of Nissan not being a joint employer.  It acknowledged that Nissan required that the technicians clock into one project at a time for warranty work and defined the general requirements dealers must follow to be paid for that warranty work, but found that Nissan did not handle the hiring, terms of employment, and assignment of tasks that are required under this factor.  We agree.  There is nothing in the APRM or other evidence that they cite that supports the Technicians' arguments on this factor.  All of the strictures in the APRM are macro in nature and are aimed at ensuring uniformity and quality in the warranty repairs.  Indeed, the nature and degree of control exercised by Nissan over the Technicians is considerably less than that found to be insufficient in *Layton* and *Aimable*.

2. The degree of supervision, direct or indirect, of the work

We have stated that supervision can be present regardless of whether orders are communicated directly to the alleged employee or indirectly through the contractor. *Aimable*, 20 F.3d at 441. However, "infrequent assertions of minimal oversight do not constitute the requisite degree of supervision." *Martinez–Mendoza*, 340 F.3d at 1211 (discussing "degree of supervision" factor set forth in *Aimable*).

In *Layton*, the drivers argued that DHL managers oversaw and critiqued the drivers loading their trucks at the DHL

warehouse. The managers also audited the drivers' trucks and uniforms to ensure they complied with DHL-imposed standards and communicated with the drivers via scanners in unusual situations. We agreed that these constituted a small amount of supervision but disagreed that these scanners, which gathered information and sent it to the DHL headquarters at the end of the day, amounted to supervision. 686 F.3d at 1179. We concluded that the amount of supervision was insufficient and that this factor did not weigh strongly in favor of joint employment. *Id.*

The Technicians combine their discussion of factors one and two in their filings below and thus their arguments are recounted above. *See* Doc. 153 at 9-12; Doc. 169 at 10-13. Again relying on depositions and declarations, the district court found this factor did not weigh in favor of joint employment. What the Technicians point to in the APRM are standards that Nissan required for warranty and service work in order for the dealership to receive reimbursement; this does not amount to supervision. While Nissan did have the Anomalous Repair Control program to determine if any of the technicians was frequently producing inadequate work, this was considerably less in scope and frequency than the level of oversight seen in *Layton* and/or *Aimable*, which we rejected as insufficient supervision and thus not enough to weigh in favor of joint employment.

3. The power to determine the pay rates or the methods of payment of the workers

The Technicians argue Nissan has the power to determine their pay rates and compensation through the flat rate program. They argue that the APRM states that if certain requirements are not met by the technician, Nissan may chargeback or not approve warranty claims, which, they argue, affects their earnings. In short, the Technicians argue that Nissan's flat-rate program affects what they are paid.

Although the Technicians baldly claim that the flat rate program dictates their pay, they point to no evidence other than their own conclusory statements that it does. The APRM does not state this and neither do the bulletins—they merely set the amount Nissan will pay the dealers. Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Nissan provided evidence that dealerships pay their technicians separately from the flat-rate program which determines the amount that Nissan reimburses the dealership for warranty work; it does not determine the wage that the dealership pays its employee, even if that employee happens to be a technician working on a warranty job. The dealerships determine the rate they will pay the technicians. This is how the district court described the flat-rate program and the separate, independent payment of wages to the Technicians by the dealerships. The Technicians have failed to show that these are facts that are either clearly erroneous or disputed. Accordingly, we agree with the district court that the undisputed evidence shows that the dealers

determined the pay for the Technicians, not Nissan.  *See* Doc. 194 at 6-7.

4. The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers

The Technicians argue that Nissan required the mechanics be certified before performing work and in order to be paid.  They point to the APRM's classification of different jobs and their specific duties, and Nissan's requirements that the dealerships have such employees and can demand they attend specific training.  Through these means, the Technicians argue that Nissan directly and indirectly controls the hiring of technicians at the dealerships and their employment conditions.

In *Layton*, we noted that the only involvement DHL had in the hiring process was by requiring that all drivers pass a background check.  686 F.3d at 1179. Additionally, we stated that DHL decisions that impacted the drivers' hours was a modification of their employment conditions.  *Id*.  However, we concluded that this control was insufficient and thus the factor weighed against joint employment.

Here, there is some involvement in the dealership employment process because of Nissan's requirements about qualifications for the technicians who performed warranty work (although not for those who did not perform such work).  And the required follow-up training for those warranty-work performing mechanics does evince some modification of the employment conditions.  However, the dealerships ultimately control the hiring, firing and

promotions of the employees as well as the bulk of their employment conditions. We cannot conclude that Nissan's involvement in the employment process with respect to the Technicians is any more substantial than that held insufficient in *Layton* and *Aimable*. For these reasons, this factor does not weigh in favor of joint employment.

### 5. Preparation of the payroll and payment of wages

The Technicians do not contest the district court's conclusion that because Nissan only occasionally paid the Technicians directly (via a voluntary incentive program that would simply add some to the dealership's core wage), this factor weighed against finding joint employment but not strongly.

### 6. Ownership of the facilities where work occurred

"[O]wnership of the [] laborers' worksite [is] relevant to our inquiry because 'without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors.'" *Id.* at 1180 (quoting *Antenor v. D & S Farms*, 88 F.3d 925, 937 (11th Cir. 1996)). In *Layton*, we rejected the argument that DHL's stipend to cover maintenance, fuel, and insurance of the employer-owned vans demonstrated control over the vans. *Id.*

Here, the Technicians argue that Nissan controls the dealerships even if it does not own them and it even attempts to prevent labor law violations, although they do not explain how. They argue that the Dealership Agreement demonstrates control over the

location, appearance, layout, equipment, and signage of the dealership, evincing a level of control.

Under Florida law, manufacturers cannot own dealerships. Fla. Stat. § 320.696.  While the Dealership Agreement does contain the strictures on the dealerships that the Technicians recount regarding usage and location, these do not relate to the prevention of labor law violations.  And to the extent that the Agreement does contain a clause stating the dealerships should comply with all federal, state, and local laws, this is too general to demonstrate the type of control that could prevent labor law violations.  Thus this factor weighs against joint employment.

7. Performance of a specialty job integral to the asserted joint employer's business

We stated in *Layton* that:

> This factor is derived from *Rutherford* [*Food Corp. v. McComb*], in which the Supreme Court found that meat boners recruited by a labor contractor to work at a slaughterhouse were, under the FLSA, joint employees of the slaughterhouse. 331 U.S. [722,] 729, 67 S. Ct. [1473,] 1476 [1947]. Although the workers brought their own tools and were labeled as independent contractors, *see id*. at 724–25, 67 S. Ct. at 1474, the Court focused on the fact that the workers completed one process in the middle of a series of interdependent steps at the slaughterhouse. The facts led the Court to conclude that the workers "did a specialty job on the production line" that was "more like piecework than an enterprise that actually depended

> for success upon the initiative, judgment or foresight
> of the typical independent contractor." *Id.* at 730, 67
> S. Ct. at 1477. Because the workers were "part of the
> integrated unit of production" of the slaughterhouse,
> the Court found them to be employees of the estab-
> lishment. *Id.* at 729, 67 S. Ct. at 1476.

686 F.3d at 1180.  In the farming context, we have stated that "[t]his factor is probative of joint employment because a worker who performs a routine task that is a normal and integral phase of the grower's production is likely to be dependent on the grower's overall production process." *Antenor*, 88 F.3d at 937.

The Technicians assert that their role as Nissan certified and trained mechanics and Nissan's advertisements emphasizing their training shows that they had a specialty job that was integral to Nissan's business.  Although Nissan touts the training of the technicians as a selling point for their vehicles, the job that the technicians do is also performed by non-Nissan trained mechanics in garages outside of the dealerships.  Because their job is thus not integral to the production of the vehicles, this factor does not weigh in favor of joint employment.

8. The relative investments of the asserted joint employer in equipment and facilities used by the workers

As we noted in *Antenor*, we consider this factor because workers are more likely to be economically dependent on the person who supplies the equipment or the facilities.  88 F.3d at 937.  In *Layton* we stated that the factor was a wash because the driver's employer owned the vans while DHL owned the warehouses

where the drivers loaded goods in the vans. 686 F.3d at 1181. Here, the dealerships are owned by the dealers, not Nissan, and tools used by the Technicians are owned either by the technicians themselves or the dealerships. Payments made by Nissan to the dealerships for warranty services rendered and the provision technical bulletins and other support for warranty work do not amount to investment in equipment or facilities. Thus this factor weighs against joint employment.

Because none of the factors weigh in favor of joint employment, the district court did not err in finding that Nissan was not a joint employer of the Technicians. Indeed, the instant case falls far short of rising to the status of joint employment. The relevant factors in this case weigh more heavily against joint employment than in *Layton*, *Martinez-Mendoza*, or *Aimable*. Further, as detailed above, there is no evidence that the district court ignored the Technicians' evidence.

### B. FLSA Collective Action/Rule 23 Class Certification

The FLSA authorizes collective actions against employers accused of violating the FLSA. 29 U.S.C. § 216(b). To maintain a collective action under the FLSA, plaintiffs must demonstrate that they are similarly situated. *Morgan*, 551 F.3d at 1258. Under Rule 23, class certification is appropriate when, among other things, there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a).

We have rejected the idea that summary judgment in favor of a defendant on the joint employer issue automatically resolves the issue of class certification. *Martinez-Mendoza*, 340 F.3d at 1215-16.  The district court recognized this in its opinion.  We do not think that the court abused its discretion when it held that certification of a class action or a collective action was not appropriate.  The putative class members would be employed by different dealers, making the inquiries about their pay highly individualized and unwieldy.  We agree with the district court that the employees of the several different dealerships would not be similarly situated (as required for a collective action) and that there would not be sufficient common facts (as required for a class action).

Because we agree with the district court that the facts do not support a finding that Nissan is a joint employer and because class certification and collective action would be inappropriate, the judgment of the district court is

AFFIRMED.[3]

---

[3] The district court also granted summary judgment, rejecting the Technicians' unjust enrichment claim.  We doubt that the Technicians' initial brief on appeal fairly raised a challenge to the district court's ruling in this regard, but, in any event, we agree with the district court that the Technicians failed to adduce evidence of a benefit to Nissan from the Technicians as required by Florida law.